[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-13148

_____

GINA SIGNOR,
individually and on behalf of all those similarly
situated,

Plaintiff-Appellant,

*versus*

SAFECO INSURANCE COMPANY OF ILLINOIS,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

D.C. Docket No. 0:19-cv-61937-WPD

_____

Before WILLIAM PRYOR, Chief Judge, JILL PRYOR, and GRANT, Circuit Judges.

JILL PRYOR, Circuit Judge:

This appeal arises out of an insurance dispute between Gina Signor and Safeco Insurance Company of Illinois. After an accident in which her vehicle suffered substantial damage, Signor made a claim under her Safeco-issued insurance policy for the damage. Safeco declared her vehicle a total loss and paid her what it deemed to be the actual cash value of her vehicle.

According to Signor, under the terms of the insurance policy and Florida law she was entitled to a greater payment. She sued Safeco, claiming that it had breached the insurance policy in two ways. First, she alleged that Safeco breached the policy because its methodology to calculate actual cash value ran afoul of Florida law. Second, she alleged that it breached the policy when it refused to reimburse her for dealer fees (administrative fees related to the sale of a vehicle) that she had to pay when she purchased a new vehicle to replace her damaged one.

The district court granted summary judgment to Safeco, concluding that it had not used an illegal methodology to calculate the vehicle's actual cash value and was not required to reimburse Signor for her dealer fees. After careful review, and with the benefit of oral argument, we affirm.

# I.    BACKGROUND

Signor was in an automobile accident that damaged her vehicle, a 2014 Lexus. At the time of the accident, Signor had an automobile insurance policy with Safeco. Under the terms of the insurance policy, Safeco agreed to pay for "direct and accidental loss" to the vehicle up to its "actual cash value." Doc. 62-1 at 46, 50.[1]

Upon examining Signor's vehicle after the accident, Safeco deemed the vehicle a total loss. Safeco then set about calculating the actual cash value of Signor's vehicle. To make this determination, Safeco used the Certified Collateral Corporation ONE Market Valuation system ("CCC system"). The CCC system is designed to value a vehicle by calculating the sale price of the vehicle immediately before it was declared a total loss. To calculate the starting "[b]ase [v]alue" of Signor's Lexus, the CCC system obtained the dealer-advertised prices of 12 comparable vehicles, which were the same make, model, and year as Signor's vehicle. Doc. 164 at 4. The vehicles' advertised prices ranged from $15,939 to $19,937.

The CCC system then applied a "Uniform Condition Adjustment" to the prices of the 12 comparable vehicles by deducting $1,064 each from their dealer-advertised prices. The purpose of the Uniform Condition Adjustment was to account for the difference between dealership vehicles that were in "Dealer Ready" condition and privately owned vehicles that were in "Normal Wear" condition. Doc. 164 at 5. After the adjustment was applied, the CCC

---

[1] "Doc." numbers refer to district court docket entries.

System averaged the resulting prices for the 12 vehicles. Using the average, the CCC system calculated the actual cash value of Signor's Lexus as $17,377. It then added a "component condition adjustment" to account for the condition of her vehicle. Doc. 164 at 4. Based on the above-average condition of Signor's vehicle, the component condition adjustment amounted to an upward adjustment of $589. All told, Safeco offered Signor $17,966 as the actual cash value of her vehicle.

In total, Safeco paid Signor $18,701.71 for her claim. This amount included $17,966 for the actual cash value of her vehicle plus $1,235.71 in taxes and state-mandated fees, minus Signor's deductible of $500.

Signor purchased a Subaru Legacy to replace her vehicle. In purchasing the vehicle, she paid $899 in dealer fees out of pocket. Dealer fees cover "the costs and profit to motor vehicle dealers for items such as inspecting, cleaning, and adjusting vehicles, and preparing documents related to the sale of a motor vehicle." Doc. 164 at 5. The amount Safeco paid Signor for the loss of her Lexus did not cover the dealer fees she paid to purchase her new vehicle.

Signor disputed the amount Safeco offered as her Lexus's actual cash value under the policy. She based her challenge on a higher estimate of her vehicle's value that she obtained from the National Automobile Dealers Association ("NADA"). She relied on NADA's "Clean Retail Value," which estimates the cost to purchase a used vehicle from a dealership without taking the vehicle's

condition into consideration. She also objected to Safeco's refusal to pay the dealer fees she incurred in purchasing her new vehicle.

Unable to resolve the dispute with Safeco over the value of her vehicle, Signor filed a putative class action against the insurer. In her lawsuit, she alleged a breach of the policy and sought a declaratory judgment that the policy did "not allow Safeco to adjust and settle total loss claims using the CCC system and that Safeco must pay dealer fees under the [p]olicy." Doc. 1-1 at 3.

After discovery, the parties filed cross motions for summary judgment.[2] The district court granted summary judgment in Safeco's favor, concluding that Safeco's methodology for calculating actual cash value did not violate Florida law and that Safeco was not required, in this instance, to pay dealer fees as part of the actual cash value. Signor appealed.

## II.    STANDARD OF REVIEW

We review a district court's rulings on cross-motions for summary judgment *de novo*, viewing the facts in the light most favorable to the nonmoving party on each motion. *James River Ins. Co. v. Ultratec Special Effects, Inc.*, 22 F.4th 1246, 1251 (11th Cir. 2022). Summary judgment is appropriate when a movant shows that there is "no genuine dispute as to any material fact and the

---

[2] While discovery was pending, Signor filed a motion for class certification, which the district court denied. Signor later filed a motion to alter the class certification order, which the district court also denied.

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.    DISCUSSION

First, Signor argues that the district court erred in granting summary judgment on her claim that Safeco breached the policy by using an illegal methodology to calculate actual cash value. Second, she maintains that the district court erred in granting summary judgment on her claim that Safeco was required to reimburse her for the dealer fees she incurred in purchasing her new vehicle. We address each argument in turn.

## A.    The District Court Did Not Err in Granting Summary Judgment to Safeco on the Illegal Methodology Claim.

Under the policy, Safeco agreed to pay Signor for the "direct and accidental loss" to her vehicle up to its "actual cash value." Doc. 62-1 at 46, 50. Safeco does not dispute that under the terms of the policy it had to comply with a Florida statute setting forth how an automobile insurer calculates the actual cash value of a vehicle.[3] *See* Fla. Stat. § 626.9743(5).

The statute provides that when an "insurance policy provides for the adjustment and settlement of first-party motor vehicle

---

[3] The policy incorporates Florida law; if Safeco's methodology does not comport with Florida law, it has breached the policy. *Found. Health v. Westside EKG Assocs.*, 944 So. 2d 188, 195 (Fla. 2006) ("Florida courts have long recognized that the statutory limitations and requirements surrounding traditional insurance contracts may be incorporated into an insurance contract for purposes of determining the parties' contractual rights.").

total losses on the basis of actual cash value," an insurer "shall use one of [a set of enumerated] methods" to determine that value. *Id.* One of the enumerated methods permits the insurer to "elect a cash settlement based upon the actual cost to purchase a comparable motor vehicle." *Id.* § 626.9743(5)(a). The statute further provides that "[s]uch cost may be derived from" one of three methods:

> 1.      When comparable motor vehicles are available in the local market area, the cost of two or more such comparable motor vehicles available within the preceding 90 days;

> 2.      The retail cost as determined from a generally recognized used motor vehicle industry source such as:

>> a.      An electronic database if the pertinent portions of the valuation documents generated by the database are provided by the insurer to the first-party insured upon request; or

>> b.      A guidebook that is generally available to the general public if the insurer identifies the guidebook used as the basis for the retail cost to the first-party insured upon request; or

> 3.      The retail cost using two or more quotations obtained by the insurer from two or more licensed dealers in the local market area.

*Id.* § 626.9743(5)(a)(1)–(3).

Signor argues that Safeco's methodology for calculating actual cash value is inconsistent with Florida law and thus breached the insurance policy. She acknowledges that subsection (5)(a)(1) permits an insurer to calculate actual cash value based on "comparable motor vehicles . . . available in the local market area . . . within the preceding 90 days." *Id.* § 626.9743(5)(a)(1). She contends, however, that Safeco has not complied with the methodology described in subsection (5)(a)(1) for three reasons.

First, she contends that Safeco failed to comply with subsection (5)(a)(1) because it adjusted the prices of the comparable vehicles used to calculate the actual cash value of Signor's vehicle. To calculate the actual cash value, Safeco relied on the CCC system, which values a vehicle by calculating the sale price of the vehicle immediately before it was declared a total loss. The CCC system began its calculation by inputting the advertised prices of other comparable vehicles in the area. The system then applied Uniform Condition Adjustments, that is, uniform deductions from the advertised price of each vehicle to account for the differences between the "Dealer Ready" condition of the vehicles ready for sale and the "Normal Wear" condition of Signor's vehicle. Signor argues that because Safeco adjusted the advertised prices of the comparable vehicles, it failed to calculate an actual cash value based on comparable motor vehicles and thus violated the statute.

Second, Signor argues Safeco violated Florida law by using the advertised prices of comparable vehicles, rather than their actual sale prices, as the starting point for calculating the base value

of her vehicle. According to Signor, because the amount of money needed to purchase a vehicle from a dealer (the "cost") is never the same as the advertised price, the cost of comparable vehicles can only be determined from actual sales transactions.

Third, she contends that Safeco violated subsection (5)(a)(2) because the statute requires that an electronic database used to calculate actual cash value must be considered a "generally recognized used motor vehicle industry source." These arguments require us to interpret section (5) of the statute.

The meaning of this statute is a question of first impression in our Circuit. Further, we have no authoritative interpretation of it from Florida's appellate courts to guide us. We therefore begin with the plain meaning of the statute's terms. *Edison v. Douberly*, 604 F.3d 1307, 1310 (11th Cir. 2010). "In construing terms appearing in insurance policies, Florida courts commonly adopt the plain meaning of words contained in legal and non-legal dictionaries." *Watson v. Prudential Prop. & Cas. Ins. Co.*, 696 So. 2d 394, 396 (Fla. Dist. Ct. App. 1997) (citation omitted). We must not read a single word or provision in a statute in isolation; instead, we must read the term or provision within the context of the entire statute. *Alonso v. State*, 17 So. 3d 806, 808 (Fla. Dist. Ct. App. 2009).

We begin with Signor's argument that Florida law does not permit Safeco to adjust the cost of comparable vehicles to calculate actual cash value. We conclude that the text of the statute does not support her position.

Subsection (5)(a) provides that an insurer may offer a cash settlement "based upon the actual cost to purchase a comparable motor vehicle." Fla. Stat. § 626.9743(5)(a). It further provides that "[s]uch cost may be derived from" one of the three methods enumerated in subsections (5)(a)(1) through (5)(a)(3). *Id.* Here, only the first method, set forth in subsection (5)(a)(1), is at issue. But before we get to subsection (5)(a)(1), we need to determine what it means for the cash settlement to the insured to be "based upon" the actual cost "derived from" one of the three methods for calculating value. *Id.* Let us take these terms in reverse order. The phrase "derived from" means originated from or obtained from. *Derivation*, Black's Law Dictionary (11th ed. 2019) ("The origin of something, esp[ecially] a word, phrase, or idea."); *see also Derive*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/derive (last visited June 25, 2023) ("[T]o take, receive, or obtain especially from a specified source[.]"). Although the statute mandates that insurers derive the actual cost from one of the three methods set forth in subsections (5)(a)(1) through (5)(a)(3), the actual cost need only originate from or be obtained from these sources. The statute's use of "derived from" instead of "equal to" or similar language means that the cost of comparable vehicles in subsection (5)(a)(1) must be the starting point for determining actual cost, but not necessarily the ending point. The actual cost need not be the *same* as the cost of comparable vehicles.

And even once the actual cost has been calculated, the cash settlement to the insured need not be the same as the actual cost to purchase a comparable vehicle. Subsection (5)(a) merely

requires the cash settlement amount to be "based upon" the actual cost. The plain meaning of the verb "base" is "[t]o make, form, or serve as a foundation for[;] . . . to ground." *Base*, Black's Law Dictionary (11th ed. 2019); *see also Base*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/base (last visited June 25, 2023) ("[T]o find a foundation or basis for[.]"). The statute's use of the phrase "based upon" indicates that even after the insurer calculates actual cost from one of the three authorized methods, it may adjust that value to determine the cash settlement amount.

Thus, we conclude that an insurer's calculation of actual cost must originate from one of the three enumerated methods, in which an insurer must only begin with, as the foundation of its actual cost calculation, the particular method, such as the cost of comparable vehicles.[4] The statute does not require that a

---

[4] Our dissenting colleague argues that the "better interpretation is that 'derived from' restricts the source material and 'based upon' recognizes certain settlement-specific adjustments." Dissenting Op. at 4. We agree in part and disagree in part with her reading. First, we agree that the statute requires insurers to derive the actual cost from—that is, begin with—the three sources specified in section (5)(a). Our disagreement with the dissent is over the meaning of "derived from." Contrary to our dissenter's view, the Uniform Condition Adjustment is not another, unauthorized source from which actual cost is derived, *see id.*, because the actual cost is still derived from the cost of comparable vehicles notwithstanding the Uniform Condition Adjustment.

settlement based upon the vehicle's actual cost be *equal* to the actual cost to purchase a comparable vehicle. Thus, Safeco's application of the Uniform Condition Adjustment to the cost of comparable vehicles is not prohibited by the statute.

We turn next to Signor's argument that Safeco violated Florida law by relying on advertised prices, rather than sale prices, in calculating the actual cash value of Signor's vehicle. We reject this

---

Second, our dissenting colleague argues that "based upon" refers to "certain routine adjustments made to 'actual cost' during the settlement process." *Id*. at 6. To be sure, the qualifying phrase "based upon" makes clear that an insurer may offer a settlement amount obtained through appropriate adjustments to the list price of comparable vehicles. According to the dissent, though, the Uniform Condition Adjustment violates the statute because it was performed *before* Safeco arrived at the actual cost of Signor's vehicle, that is, the Adjustment was necessary to calculate the actual cost itself. We disagree. As long as a cash settlement is *based upon* the actual cost to purchase a comparable vehicle and that cost was *derived from* the cost of comparable vehicles (or from the other two listed sources), the insurer has complied with the statute, regardless of the order in which the adjustments were performed.

In context, this approach makes sense. It is improbable that a car on a dealership lot—cleaned up, repaired, and ready for sale—would be equal in value to the same type of car with normal wear and tear. The Uniform Condition Adjustment accounts for this difference; it is not an invitation to invent settlement amounts with "freewheeling discretion." *Id*. at 1. By contrast, the dissent's interpretation would require insurers systematically to overvalue insured vehicles based on the cost of replacing them with vehicles in better condition.

argument because the statute does not prohibit an insurer from relying on advertised prices in its valuation.

Subsection (5)(a)(1) permits an insurer to use the cost of comparable motor vehicles *"available* within the preceding 90 days."* Fla. Stat. § 626.9743(5)(a)(1) (emphasis added). The term "available" means that the comparable vehicles were ready and able to be purchased within the 90-day time period. *Available*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/available (last visited June 25, 2023) ("[P]resent or ready for immediate use[.]"). A vehicle could have been available for purchase within the past 90 days and still be available, so that only an advertised price would be known. It does not matter, under the statute's plain language, whether the vehicle was sold. All that matters is that the comparable vehicles were available for sale within the preceding 90 days. Accordingly, an insurer can rely on advertised prices in its valuation.

We are equally unpersuaded by Signor's argument that the cost to purchase a vehicle is never the same as the vehicle's advertised price because advertised prices fail to account for title, license, and "dealer fees, additional undisclosed costs or fees, non-qualifying rebates, negotiations, or ambiguity in an advertisement." Appellant's Br. at 43. But Florida law requires that an advertised price include all fees and charges except for registration and title fees, tags, and taxes. *See* Fla. Stat. § 501.976(16). Moreover, we can imagine many factors affecting a vehicle's sale price that do not affect the value of the vehicle. Perhaps the dealer reduced the price

because she had too many cars on the lot. Or maybe the buyer was a particularly good negotiator. But the statute does not require the insurer to account for these idiosyncratic factors, which may have nothing to do with the value of the vehicle.

Signor further argues that if subsection (5)(a)(1)'s use of the term "cost" is broad enough to include advertised prices, then it must also include dealer quotations, rendering subsection (5)(a)(3) superfluous. *Cadwell v. Kaufman, Englett & Lynd, PLLC*, 886 F.3d 1153, 1159 (11th Cir. 2018) ("We disfavor interpretations of statutes that render words or clauses superfluous." (citation omitted)); *Hawkins v. Ford Motor Co.*, 748 So. 2d 993, 1000 (Fla. 1999) ("Statutory interpretations that render statutory provisions superfluous are, and should be, disfavored." (citation and internal quotation marks omitted)). Under subsection (5)(a)(3), an insurer may derive actual cost from the retail cost of a motor vehicle by obtaining two or more quotations from local licensed dealers. Fla. Stat. § 626.9743(5)(a)(3). If the statute's use of the term "cost" includes advertised prices, Signor argues, then the term is also broad enough to include dealer quotations, which are the "prices at which dealers commit to sell cars." Appellant's Br. at 44 (citing *Quotation*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/quotation). Thus, according to Signor's argument, an insurer who satisfies subsection (5)(a)(3) would always satisfy subsection (5)(a)(1), making subsection (5)(a)(3) superfluous.

Signor's argument, however, disregards subsection (5)(a)(1)'s requirement that cost be based on that of a motor vehicle

"available within the preceding 90 days." Fla. Stat. § 626.9743(5)(a)(1). Subsection (5)(a)(3) requires only that the quotations are from local licensed dealers. Even if an insurer sought to comply with subsection (5)(a)(3) by obtaining a quotation made by a licensed dealer *within the preceding 90 days*, the insurer would not also have satisfied subsection (5)(a)(1). A quotation of a retail price is only a hypothetical price, while an advertised price reflects the price of an immediately available vehicle. In other words, subsection (5)(a)(1) allows an actual cost valuation to be based on the cost of a tangible vehicle, available for purchase, while subsection (5)(a)(3) allows an insurer to base its calculation on an estimated price from a licensed dealer.

There may indeed be instances where an insurer who satisfies subsection (5)(a)(3) also satisfies subsection (5)(a)(1). For example, a licensed dealer may provide a price quotation that is in fact the advertised price of an available vehicle. But overlap between statutory provisions does not necessarily render a statutory provision superfluous. *Young v. Grand Canyon Univ., Inc.*, 980 F.3d 814, 820 (11th Cir. 2020) ("Language in two separate sections of a regulation isn't superfluous merely because it overlaps."). Because an insurer can satisfy subsection (5)(a)(3) by providing a price quotation that is only a hypothetical price, subsection (5)(a)(3) allows a valuation that would not be permissible under subsection (5)(a)(1). Subsection (5)(a)(3), then, has a stand-alone role—to allow a cost valuation based on a hypothetical price without requiring the availability of a comparable vehicle. Thus, subsection (5)(a)(3) is not

superfluous even if we read the term "cost" in subsection (5)(a)(1)
to include advertised prices.

Lastly, we consider Signor's argument that Safeco's use of
the CCC system, an electronic database, violated the statute be-
cause the system was not a "generally recognized used motor ve-
hicle industry source," as required by subsection (5)(a)(2). Fla.
Stat. § 626.9743(5)(a)(2).

Subsection (5)(a)(2) provides another alternative methodol-
ogy for an insurer to derive actual cost: from "[t]he retail cost as
determined from a generally recognized used motor vehicle indus-
try source." *Id.* The subsection goes on to provide an example of
such a source: an electronic database.[5] *Id.* § 626.9743(5)(a)(2)(a).
But to accept Signor's argument would mean that an insurer who
relies on the methodology described in subsection (5)(a)(1) to es-
tablish the cost of two or more available comparable vehicles, and
in doing so uses an electronic database, must *also* comply with sub-
section (5)(a)(2). The text of the statute, however, does not support
her argument.

For one thing, an insurer is not required to comply with
more than one of the enumerated methods listed under subsection

---

[5] An insurer must meet further conditions if it uses an electronic database to
comply with the methodology described in subsection (5)(a)(2). *See* Fla.
Stat. § 626.9743(5)(a)(2)(a) ("[Such as] [a]n electronic database if the pertinent
portions of the valuation documents generated by the database are provided
by the insurer to the first-party insured upon request."). Those conditions are
not relevant here.

(5)(a). The statute states that actual cost "may be derived from" a list of three distinct methods, joined by the disjunctive term "or." *See generally id.* § 626.9743(5)(a), (5)(a)(1)–(3). Under Florida law, the term "or" "normally indicates that alternatives were intended." *Sparkman v. McClure*, 498 So. 2d 892, 895 (Fla. 1986). Thus, when an insurer relies on the methodology described in subsection (5)(a)(1) to calculate actual cost, the statute does not require that the insurer also comply with subsection (5)(a)(2).[6]

For another thing, adopting Signor's reading of the statute would run afoul of the canons of statutory construction. To determine whether restrictions in one policy provision apply to another policy provision, we turn to these canons for guidance. According to the Scope-of-Subparts canon, "[m]aterial within an indented subpart relates only to that subpart," whereas "material contained in unindented text relates to all the following or preceding indented subparts." *Scherer v. Volusia Cnty. Dep't of Corr.*, 171 So. 3d 135, 138 (Fla. Dist. Ct. App. 2015) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 156 (2012)). Thus, subsection (5)(a)(2)'s use of "a generally recognized used motor vehicle industry source" relates to subparts (5)(a)(2)(a) and (5)(a)(2)(b), which follow the subsection. Subpart (5)(a)(2)(a),

---

[6] Insofar as Signor argues that Safeco violated subsections (5)(a)(2) and (5)(a)(3), we need not reach these arguments because we conclude that Safeco complied with subsection (5)(a)(1), and compliance with more than one subsection of section (5)(a) is not required. *See* Fla. Stat. § 626.9743(5)(a)(1)–(3) ("Such cost may be derived from: [one of the three methods listed in the disjunctive].") *Sparkman*, 498 So. 2d at 895.

which appears to be an indented subpart, does not relate to subsection (5)(a)(1). Thus, the restriction concerning "a generally recognized used motor vehicle industry source" only relates to the methodology described in subsection (5)(a)(2); it does not relate to the methodology described in subsection (5)(a)(1).

In addition, subsection (5)(a)(2) introduces subpart (5)(a)(2)(a) with the phrase "such as," suggesting that subpart (5)(a)(2)(a) concerns one alternative form (a database) of a "generally recognized used motor vehicle industry source." Fla. Stat. § 626.9743(5)(a)(2). Safeco's use of an electronic database to comply with subsection (5)(a)(1), though, does not require compliance with the methodology described in subsection (5)(a)(2) simply because use of a "generally recognized used motor vehicle industry source" may include the use of a database.

To sum up, Safeco's use of the Uniform Condition Adjustment, advertised prices, and the CCC system to calculate the actual cash value of Signor's vehicle complied with the statute. *Id.* § 626.9743(5). We therefore conclude that Safeco's actual cash value methodology did not violate Florida law.

## B.  The District Court Did Not Err in Granting Summary Judgment to Safeco on the Dealer-Fees Claim.

Signor argues that Safeco breached the terms of the policy by failing to pay, as part of her vehicle's actual cash value, dealer fees she incurred in purchasing a replacement vehicle. Florida and Eleventh Circuit caselaw does not support her argument, however.

We have previously interpreted the term "actual cash value" in a Florida-issued insurance policy in *Mills v. Foremost Insurance Co.*, 511 F.3d 1300 (11th Cir. 2008). Although *Mills* concerned mobile home insurance, we find it applicable in the motor-vehicle insurance context as well. Thus, we begin by revisiting *Mills*.

The Millses owned a mobile home insured by Foremost. *Id.* at 1302. Under the policy, when the policyholder suffered a partial loss to an insured mobile home, Foremost would pay benefits using one of two methods. *Id.* at 1304. Both methods were tied to "actual cash value," a term the policy defined as "cost to repair or replace . . . less allowance for . . . depreciation." *Id.* After a hurricane damaged their mobile home and personal property, the Millses submitted a claim under the policy for the damage. *Id.* at 1302. Foremost's payment of the claim did not include, as relevant here, "contractors' overhead and profit charges . . . incurred by the Millses in having their hurricane-damaged property repaired or replaced." *Id.* The Millses filed suit, and the district court ruled in favor of Foremost. *Id.* at 1302–03.

On appeal, we reversed. *Id.* at 1311. The proper question, we said, was whether contractor overhead and profit charges should be included in actual cash value. *Id.* at 1305. We concluded that the overhead and profit charges must be included in the insurer's actual-cash-value calculation if the Millses *"would be reasonably likely to need* a general contractor in . . . replacing the damaged property in issue." *Id.* at 1306 (emphasis added).

Here, we face a question analogous to the one presented in *Mills*: whether costs in the form of dealer fees are properly included in a vehicle's actual cash value. As a preliminary matter, the Safeco policy does not define actual cash value. So, we turn to Florida law to fill in the gap. Even absent a definition of the term in the policy, the Florida Supreme Court has interpreted the term "actual cash value" in an insurance policy to mean replacement cost less depreciation. *Trinidad v. Fla. Peninsula Ins. Co.*, 121 So. 3d 433, 438 (Fla. 2013) ("[A]ctual cash value is generally defined as . . . replacement cost minus normal depreciation." (citation and internal quotation marks omitted)).

*Trinidad*'s definition of actual cash value is the same as the policy's definition of the term in *Mills*. 511 F.3d at 1304 (noting that the Millses' policy defined actual cash value as the "cost to repair or replace property . . . less allowance for . . . depreciation" (internal quotation marks omitted)). And the question before us is whether replacement cost includes dealer fees.

In *Mills*, we "easily conclude[d]" that replacement cost included state and local taxes on the materials purchased to make repairs, noting that under Florida law, state and local taxes are applied to materials and labor associated with repairs. *Id.* at 1305. We also concluded that a contractor's overhead and profit were part of replacement cost because they were "well-recognized types of costs routinely charged." *Id.* Therefore, under *Mills*, replacement cost includes costs that are routine and necessary. *See id.*

We noted, however, that the Millses were not entitled to payment for "any type of cost charged by a general contractor without showing that they would be reasonably likely *to need* a general contractor." *Id*. at 1306 (emphasis added). We thus agree with the district court that the inquiry is not one of statistical likelihood, that is, how statistically likely is a policyholder to incur dealer fees; instead, the inquiry turns on necessity.

Signor correctly observes that in *Mills* we also described the issue as "whether it is reasonably likely that the policyholder would incur these costs in making the repairs." *Id*. But she takes this quote out of context. When read in its entirety, the opinion's lengthy discussion makes clear that it must be reasonably likely to be necessary for the insured to incur the costs in question. *Id*. The district court, then, applied the correct standard in this case.

As proof that a policyholder is reasonably likely to need to incur dealer fees, Signor points to the facts that (1) she incurred dealer fees in purchasing both the Lexus that was totaled and her Subaru replacement vehicle, (2) approximately 50-70% of Safeco policyholders are likely to purchase a vehicle from a dealer, and (3) approximately 85-95% of dealerships charge dealer fees. These facts, viewed in the light most favorable to Signor, do not give rise to a genuine dispute of material fact.

Signor's three data points show a reasonable likelihood that a policyholder will incur dealer fees *if* she chooses to purchase her replacement vehicle from a dealer. And they show that a policyholder is reasonably likely to purchase a replacement vehicle from

a dealer. But they do not show that a policyholder is reasonably likely *to need* to purchase a replacement vehicle from a dealer. Signor has failed as a matter of law to satisfy the *Mills* standard; therefore, the district court correctly awarded Safeco summary judgment on this issue.

## IV.    CONCLUSION

We conclude that the district court did not err in ruling that Safeco's methodology for calculating the actual cash value of Signor's vehicle complied with Florida law and that Safeco was not required to pay Signor for her out-of-pocket dealer fees.[7] Accordingly, we affirm the judgment of the district court.

**AFFIRMED.**

---

[7] Because we affirm the district court's grant of summary judgment in favor of Safeco, we do not reach the class certification issues. *See Huff v. Dekalb Cnty.*, 516 F.3d 1273, 1282 n. 9 (11th Cir. 2008).

21-13148            GRANT, J., dissenting in part            1

GRANT, Circuit Judge, dissenting in part:

I respectfully disagree with the majority's conclusion that Florida law allows insurance companies to adjust the cost of comparable vehicles as Safeco has done here. The majority opinion recites the correct statutory language when describing the substance of paragraph 5(a)'s guarantee: "an insurer may offer a cash settlement 'based upon the actual cost to purchase a comparable motor vehicle.'" Maj. Op. at 10 (quoting Fla. Stat. § 626.9743(5)(a)). But it goes on to commit several crucial errors. In interpreting "actual cost to purchase a comparable motor vehicle," the majority fails to recognize the significance of the modifier "actual"; conflates value with "cost"; and ignores the fact that "comparable" vehicles are not identical vehicles. *Id.* at 10–12. The majority also misreads two other phrases in the statute: "derived from" and "based upon." *Id.* As a result, under the majority's interpretation, an insurer has freewheeling discretion to set "actual cost" at any amount. *Id.* at 11–12. Because the statute cannot support that interpretation, I respectfully dissent.

Under Florida Statutes § 626.9743(5)(a), insurers "may elect a cash settlement based upon the actual cost to purchase a comparable motor vehicle." Subparagraph (5)(a)(1) permits insurers to use the "the cost of two or more" comparable vehicles to arrive at this "actual cost." Here, Safeco started on the right track when it obtained the cost of twelve comparable vehicles. Maj. Op. at 3. But it went off course after that, imposing a "Uniform Condition Adjustment" to reduce the cost of all twelve

vehicles. *Id.* at 3–4. It says the comparable cars were in better condition than Signor's because they were "Dealer Ready" and—mysteriously enough—each comparable was precisely $1064 more valuable than a car with "Normal Wear." *Id.* Only after applying this adjustment did Safeco average these hypothetical costs to arrive at $17,377, which it considered the "actual cash value" of Signor's Lexus if it had "Normal Wear." *Id.* And finally, Safeco decided to add $589 to account for the condition of Signor's vehicle, landing on $17,966 for the "actual cash value of her vehicle." *Id.*

Under the plain meaning of the statute, Safeco's number was neither "actual" nor the "cost," and it did not reflect the money needed to purchase a "comparable" vehicle. *First*, it was not "actual." Around the time the statute was passed, "actual" was defined as "existing in act and not merely potentially," "existing in fact or reality," and "not false or apparent." *Actual*, Merriam-Webster's Collegiate Dictionary 12 (10th ed. 2000). Safeco's cash value estimate cannot be "actual" because it met none of these definitions. It incorporated Safeco's own reductions, rather than the real costs of real replacement cars. And under (5)(a)(1), an insurer cannot obtain a car's actual cost from hypothetical costs and adjustments.

*Second*, Safeco's cash value number was not the "cost" at all. Paragraph (5)(a) demands that insurers first calculate "the actual *cost to purchase*" a comparable car. Fla. Stat. § 626.9743(5)(a) (emphasis added). This is no theoretical number—it is the dollar

amount that an insured would need to replace her car. And it is different than the raw value of the insured's vehicle. Because of Safeco's across-the-board condition reduction, it is possible—even likely—that an insured could not purchase any of the comparable cars for the amount the insurance company says is the "actual cost" to purchase a comparable vehicle.[1]

*Third*, the majority ignores the fact that the statute calls for the "actual cost to purchase a *comparable* motor vehicle." *Id.* (emphasis added). "Comparable" means "capable of or suitable for comparison" and "similar, like." *Comparable*, Merriam-Webster's Collegiate Dictionary 233 (10th ed. 2000). Similar or suitable for comparison does *not* mean identical. With its adjustments, Safeco attempts to transform each "comparable motor vehicle" into a vehicle exactly matching the insured's, which erases the word "comparable" from the statute. By its plain terms, the "actual cost" calculation should arrive at an amount representing the purchase price of a similar, available vehicle—not the value of the insured's car itself.

The other statutory language cannot rescue Safeco's methodology. In the majority's view, "based upon" and "derived from" have identical, redundant functions in the statutory text: they grant the insurer license to adjust a settlement offer in

---

[1] I take no position on whether Safeco's use of the CCC system qualifies as a "generally recognized used motor vehicle industry source" under (5)(a)(2)(a)—neither the district court nor the majority considered this question. Maj. Op. at 17 n.6.

whatever way it deems appropriate, so long as it starts with one of the three statutory sources listed in subparagraphs (5)(a)(1)–(3). *See* Maj. Op. at 10–12. But this is not the best reading of the statute. The better interpretation is that "derived from" restricts the source material and "based upon" recognizes certain settlement-specific adjustments.

Here's why. Paragraph (5)(a) states that "actual cost" may be "derived from" three sources: (1) the cost of comparable vehicles; (2) industry sources like databases or guidebooks; or (3) licensed dealer quotations. Fla. Stat. § 626.9743(5)(a)(1)–(3). The majority correctly defines "derived from" as "originated from or obtained from." Maj. Op. at 10. But it sets aside the three listed sources to make room for one more—Safeco's "Uniform Condition Adjustment." That is contrary to the well-accepted negative implication canon, which teaches that the expression of one thing implies the exclusion of others. *See, e.g.*, *Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018); *Thayer v. State*, 335 So. 2d 815, 817 (Fla. 1976); *LaCroix v. Town of Fort Myers Beach*, 38 F.4th 941, 949 (11th Cir. 2022); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 107–11 (2012).

Here, the inclusion of three sources from which "actual cost" may be derived suggests that the Florida legislature excluded all other sources of information when an insurer calculates under (5)(a). These sources ensure that "actual cost" is actual cost. The majority, on the other hand, allows any information source or adjustment: "an insurer must only begin with, as the foundation of

its actual cost calculation, the particular method, such as the cost of comparable vehicles." Maj. Op. at 11.  I disagree that "derived from" should be read to mean "begin with."

Indeed, the statute's structure reinforces the need to read "derived from" to include only the listed sources.  The statute itself gives insurers options other than relying on the sources set out in (5)(a)—but in a different section that Safeco does not rely on. Under (5)(c), an insurer may adjust or settle "on a basis that varies from the methods described in paragraph (a)" so long as it supports the calculation with itemized amounts and documentation.  Fla. Stat. § 626.9743(5)(c).  And (5)(d) provides that an insurer may contract with its insureds to use "[a]ny other method."  *Id.* § 626.9743(5)(d).  These other provisions suggest that the statute allows for other means of compensation, but not an "anything goes" approach.  We cannot read "derived from" to allow for any result that starts with one of the three sources in 5(a); otherwise any source of data could corrupt the calculation of "actual cost," so long as a specified source was the "foundation."  Maj. Op. at 11. There is no limiting principle to this interpretation, and it cuts entirely in favor of the insurer.  That is not the best reading of (5)(a).

For similar reasons, (5)(a)'s "based upon" language cannot cure Safeco's violation.  To start, the "Uniform Condition Adjustment" was performed *before* Safeco arrived at its improper "actual cost" number, so the final number could not have been

"based upon" the actual cost.  Indeed, Safeco has presented these adjustments as necessary to calculating the actual cost itself.

The best interpretation of "based upon" is that it accounts for certain routine adjustments made to "actual cost" during the settlement process.  Fla. Stat. § 626.9743(5)(a).  Here, for example, the cash settlement offer was at least $500 lower than what Safeco calculated as the actual cost to account for Signor's $500 deductible.  And the statute provides another such example: "When the amount offered in settlement reflects a reduction by the insurer because of betterment or depreciation, information pertaining to the reduction shall be maintained with the insurer's claim file" and the "basis for any deduction shall be explained to the claimant in writing, if requested." *Id.* § 626.9743(6).  One need not locate every acceptable adjustment to a cash settlement to recognize that "based upon" does not grant unfettered discretion.

An overbroad interpretation of "based upon" would allow insurers to make any adjustment they pleased to get from "actual cost" to "cash settlement," rendering the rest of the paragraph useless.  The Florida Legislature "does not intend to enact useless provisions, and courts should avoid readings that would render part of a statute meaningless." *Larimore v. State*, 2 So. 3d 101, 114 (Fla. 2008) (quotation omitted).

\*          \*          \*

Simply put, the requirements found in the text of § 626.9743(5)(a) work together to require transparent, reliable, and understandable settlement calculations that allow customers to

21-13148          G<small>RANT</small>, J., dissenting in part          7

replace their vehicles. Because the majority misreads the words "actual," "cost," and "comparable," and misinterpreted "derived from" and "based upon," its interpretation of the statute veers away from the text. I would hold that Safeco's methodology violates § 626.9743(5)(a)(1) and respectfully dissent.